### ELJER CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 8037.

Circuit Court of Appeals, Third Circuit.

Argued Nov. 2, 1943.
Decided Feb. 24, 1943.

252

William G. Heiner, of Pittsburgh, Pa., for petitioner.

Maryhelen Wigle, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, and J. Louis Monarch, Sp. Assts. to the Atty. Gen., on the brief), for respondent.

Before BIGGS, MARIS, and GOODRICH, Circuit Judges.

MARIS, Circuit Judge.

In its income tax return for 1936 the taxpayer claimed a deduction for a bad debt which was disallowed by the Commissioner. The Board of Tax Appeals upheld the Commissioner and the principal question arising upon this review of its decision is whether $75,000 of the debt for which deduction is claimed in 1936 was available to the taxpayer as a deduction in that year under the provisions of Section 23(k) of the Revenue Act of 1936. 26 U.S.C.A. Int.Rev.Acts, pages 827, 828, 829.[1] The question arises from the following facts:

---

[1] "§ 23. Deductions From Gross Income. In computing net income there shall be allowed as deductions: * * * "(k) Bad Debts. Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

The taxpayer is a manufacturer of vitreous china plumbing fixtures. It sells most of its perfect or "A" products to Crane Company. The consistent policy of the taxpayer has been to sell its seconds or "B" grade products in territories not served by Crane Company. For some time it sold "B" products to one Philpott in Cleveland, Ohio, but found that he was unable to absorb all the seconds it was producing. In 1910 the taxpayer's stockholders caused Occidental Company to be incorporated. The officers and directors were the same as the taxpayer's. Philpott was made manager. Through various mergers, reorganizations and transfers the taxpayer became the owner of all the Occidental stock. The taxpayer sold "B" products to Occidental at prevailing prices. Because of high operating expense and poor management Occidental operated at a loss from its inception in 1910 to its dissolution in 1936. It made payments to the taxpayer from time to time upon a running account but the indebtedness mounted steadily. In 1927 Occidental owed the taxpayer more than $105,000. The taxpayer's officers, considering it deceiving to creditors to show on the books the full amount of the Occidental account as current and immediately collectible, transferred $75,000 to an account denominated "Investments." The taxpayer had a bad debts account but did not follow the practice of setting up reserves for bad, slow, or doubtful accounts. The taxpayer did not seek to deduct the $75,000 as a partially worthless debt in 1927 or in 1928. The unsegregated $30,000 remained in the taxpayer's receivables. That indebtedness in turn increased steadily. From 1929 to 1934 Occidental changed managers several times. In 1929 it changed its name to Eljer-Ohio Company. In 1934 one Dever was employed as manager and did succeed in increasing the volume of business but did not succeed in operating Occidental at a profit. In 1936 the trustee for the bondholders of the taxpayer and the taxpayer's accountants suggested and Dever insisted that the Occidental account be liquidated. It was agreed to dissolve Occidental and this was in fact formally accomplished on December 31, 1936.

In its 1936 income tax return the taxpayer deducted the sum of $84,702.62 as a bad debt charge-off computed as follow:

| | |
|---|---|
| Balance due by Eljer-Ohio Co. [Occidental] to taxpayer at date of its dissolution | 157,996.07 |
| Received by taxpayer from liquidation of assets | 10,756.46 |
| Balance of account charged off | 147,239.61 |
| Less tax advantage to taxpayer from 1921 to 1925 and 1928 resulting from filing consolidated income tax returns | 62,536.99 |
| | $ 84,702.62 |

The tax advantage thus conceded was subsequently admitted by the taxpayer to be greater in amount than $62,536.99.[2] As a matter of fact, as we shall later show, it totalled $72,667.89. The bad debt deduction in dispute is thus reduced to $74,571.89, a figure slightly less than the portion of the debt transferred to "Investments" account in 1927. Consequently the deductibility in 1936 of the portion of the debt transferred in 1927 to "Investments" account is the question for decision.

The Board of Tax Appeals determined that the Commissioner properly disallowed the deduction. It separated the total debt of $147,239.61 into two items. The item of $75,000, the amount carried in the taxpayer's books as "Investments", the Board ruled to be nondeductible for the reason that that item was not ascertained as worthless in 1936 but rather in some year prior thereto. The Board did not state in what year. Having thus first disposed of the $75,000 item the Board then concluded that the remainder of the debt [i. e. $147,239.61 less $75,000] was not deductible because the tax advantage which accrued to the taxpayer in its consolidated tax returns by reason of the Occidental losses was in excess of that amount.

This division of the debt and consequently of the controversy as to its deductibility is predicated upon the fact that the taxpayer made a separate bookkeeping entry as to $75,000 of the indebtedness. But we think that this special treatment of a portion of the debt did not create two separate debts out of what was formerly but a single indebtedness.[3] The taxpayer

[2] Subsequently the taxpayer conceded that this tax advantage was at least $66,667.72.

[3] It is undisputed that the taxpayer charged off the entire Occidental debt on its books in 1936 and that the entire debt was uncollectible and without value in 1936.

254

dealt with its customer continuously from 1910. It sold merchandise at prevailing market prices and upon an open and running account. Not a year passed without some payments by Occidental. This was just as true after 1927 as before that year. In several years the payments were in excess of the purchases. At no period during the course of its dealings with Occidental did the taxpayer give up its plans for the improvement of the latter's business so as to make it financially sound and enable it to pay its debts in full. With this objective the taxpayer caused Occidental to change its managers, its business location and even its name. The taxpayer dealt with Occidental as a customer which was slow but not hopeless. It was not until 1936 when pressure from its own creditors and from the manager of Occidental (who objected to carrying the load of a debt incurred by prior managers) became too much for the taxpayer, that it caused Occidental's liquidation.

It will thus be seen that the indebtedness of Occidental did not in fact become wholly worthless until 1936. Nor does the record indicate that the taxpayer ascertained the portion of the indebtedness represented by the $75,000 item to be worthless in 1927 or that it charged that amount off in that year. On the contrary the Board found that the taxpayer recognized that portion of the debt as slow but not worthless. It found that the taxpayer's officers thought that under proper operating conditions Occidental might be able to pay off the full amount of its debt. That the officers of the taxpayer did have the belief found by the Board is reflected in the fact that no part of the Occidental debt was charged to the bad debts account maintained by the taxpayer. Nor was anything done by the taxpayer between the years 1927 and 1936 to indicate that the taxpayer had changed its original views regarding the $75,000 item. It continued to treat that item as a slow and non-current but ultimately collectible debt.

■ However, even if the debt was partially worthless in 1927 to the extent of $75,000 it is now well settled that "If no claim for partial worthlessness is made, the debt may be deducted, in full, when it becomes entirely worthless. The privilege which is given to charge off and deduct that part of a debt which is ascertained

to be worthless does not deprive a taxpayer of the right to await the time when the debt becomes wholly worthless". 5 Mertens—Law of Federal Income Taxation, § 30.23 pp. 384, 385; Commissioner v. MacDonald Eng. Co., 7 Cir., 1939, 102 F.2d 942, 945; Bingham v. Commissioner, 2 Cir., 1939, 105 F.2d 971, 973; Kessler Oil & Gas. Co. v. Commissioner, 1940, 41 B.T.A. 31, 38; Moock Electric Supply Co. v. Commissioner, 1940, 41 B.T.A. 1209, 1211. The government urges that American Savings Bank & Trust Co. v. Burnet, 9 Cir., 1930, 45 F.2d 548, is authority to the contrary. But an examination of the opinion in that case shows that the question was expressly left open. We accordingly hold that the Board of Tax Appeals erred in deciding that none of the $75,000 portion of the debt was deductible in 1936. In so holding we accept the Board's findings of fact as supported by the evidence but apply to the facts so found the rules of law to which we have referred.

■ The government contends and the taxpayer concedes that there must be offset against the bad debt deduction in 1936 the amount by which the taxpayer benefited in prior years by including the operating losses of Occidental as an affiliate in its consolidated tax returns.[4] The amount of the losses thus taken in prior years as a deduction from the net income of the taxpayer was $72,667.72. It appears that in three of those years, however, the net income of the affiliated group was less than $25,000; consequently the taxpayer had, for those three years the benefit of the specific tax credit of $2,000 afforded by Section 236 of the Revenue Acts of 1921 and 1924. It is the contention of the taxpayer that the amount of this credit for the three years referred to, $6,000 in all, should, in computing the present offset, be subtracted from the aggregate amount of the losses contributed by Occidental to the affiliated group since, it says, the taxpayer received no actual tax benefit in respect of this sum of $6,000. We think that the taxpayer's contention in this regard cannot be sustained. The amount of $72,667.72 did actually benefit the taxpayer in reducing by that amount its taxable net income. The fact that in three of the years involved the taxpayer secured a further reduction in the amount of its tax by reason of the specific credit given

4 See Ilfeld Co. v. Hernandez, 1934, 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127, as to double deductions.

by Section 236 is a fortuitous circumstance not connected with its use of the Occidental losses unless, indeed, we regard the fact, which was true in 1924 and 1925, that the credit was actually secured to the taxpayer as the result of the reduction of its net income to less than $25,000 through the application of the Occidental loss. Viewed in this light it might well be said that the taxpayer, in those two years at least, secured a benefit of $2,000 a year more than the face amount of the Occidental loss, and not $2,000 less, as the taxpayer argues. This makes it even clearer that we are here concerned merely with the offset against income and not with its incidental tax effect.

The other question involved on this review is raised by the taxpayer's contention that in the computation of its surtax on undistributed profits of the year 1936 it is entitled to credit against its adjusted net income by reason of two written instruments which it claims are contracts restricting the payment of dividends within the meaning of Section 26(c) (1) of the Revenue Act of 1936. 26 U.S.C.A. Int. Rev.Acts, pages 835, 836.[5]

The first instrument relied on is the taxpayer's stock certificate issued in accordance with an amendment to the articles of incorporation. Printed on the reverse side of the certificate is the pertinent portion of the amended articles which provides for the creation of a sinking fund to retire the Prior Preference "A" stock and which the taxpayer contends is a contract restricting the payment of dividends.

The second instrument relied upon is an agreement modifying the terms of a mortgage securing a bond issue of the taxpayer and providing for the creation of a sinking fund to redeem the mortgage bonds.

The question whether a certificate of stock which contains an express provision prohibiting the payment of dividends is such a contract as was intended by Congress to be within the purview of Section 26(c) (1) of the Revenue Act of 1936 was answered by us in the affirmative in Lehigh Structural Steel Company v. Commissioner, 3 Cir., 1942, 127 F.2d 67, and is no longer open in this Circuit.[6]

The taxpayer is not entitled to the credit, however, because neither the contract with the stockholders nor the contract with the mortgage bondholders was executed prior to May 1, 1936. Although the articles of amendment of the articles of incorporation were signed by the taxpayers' president, attested by its secretary, and duly acknowledged as the corporate act on March 24, 1936, the Secretary of the Commonwealth of Pennsylvania did not issue a certificate of amendment until May 28, 1936. According to the statutory law of Pennsylvania amendments to articles of incorporation do not become effective until the issuance of the certificate of amendment. Act of May 5, 1933, P.L. 364, art. VIII, sec. 809, 15 Pa.P.S. § 2852—809. Consequently whatever power the corporation had to make a contract with its stockholders pursuant to the amended articles arose after May 28, 1936. The contract could, therefore, not have been legally executed by the taxpayer prior to May 1, 1936.

A similar conclusion must be reached as to the agreement modifying the mortgage. By its very terms it is clear that this agreement was executed after May 1, 1936, for its opening sentence reads: "This Agreement Dated the first day of January, 1936, and intended to bear that date, although actually executed and

---

5 "§ 26. Credits of Corporations

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\*        \*        \*        \*        \*

"(c) Contracts Restricting Payment of Dividends.

"(1) Prohibition on payment of dividends. An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of

dividends. If a corporation would be entitled to a credit under this paragraph because of a contract provision and also to one or more credits because of other contract provisions, only the largest of such credits shall be allowed, and for such purpose if two or more credits are equal in amount only one shall be taken into account."

6 In Warren Tel. Co. v. Commissioner, 6 Cir., 1942, 128 F.2d 503, the court expressed itself as in disagreement with our view. But the denial by the Supreme Court of certiorari in that case, 63 S.Ct. 440, 87 L.Ed. ——, would indicate that the decisions are not believed by that court to be in conflict.

delivered on the 18 day of June, 1936," It follows that the Commissioner properly disallowed the credits claimed by virtue of Section 26(c) (1) of the Revenue Act of 1936.

It was suggested at the argument that the taxpayer is entitled to relief against the undistributed profits tax under the provisions of Section 501(a) (3) of the Revenue Act of 1942, 26 U.S.C.A. Int.Rev.Acts by reason of the fact that it is a deficit corporation. The government has accordingly moved that the cause be remanded for the determination of this question.

The decision of the Board of Tax Appeals is reversed to the extent herein indicated and the cause is remanded to the Tax Court of the United States for the purpose of determination by that court of the application and effect on this cause, if any, of Section 501(a) (3) of the Revenue Act of 1942, and thereupon to enter a decision not inconsistent with this opinion.